IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DULCIDIO QUIRINDONGO,      :
                                 :

        **Plaintiff**        :      **CIVIL NO. 1:CV-10-01742**
                                 :

**v.**                      :      **(Judge Rambo)**
                                 :

**WARDEN RICARDO MARTINEZ,**  :
***et al.,***                   :
                                 :

        **Defendants**     :

## M E M O R A N D U M

Plaintiff Dulcidio Quirindongo, an inmate currently incarcerated at the United States Penitentiary at Allenwood ("USP-Allenwood") in White Deer, Pennsylvania, filed this *Bivens*[1]-type action on August 19, 2010, as amended July 7, 2011, against several USP-Allenwood officials and two external medical providers.[2]  (Doc. 32.)  In the amended complaint, Plaintiff asserts that Defendants

---

[1] *Bivens* actions are the federal counterpart to § 1983 claims brought against state officials. *Egervary v. Young*, 366 F.3d 238, 246 (3d Cir. 2004) (citing *Brown v. Philip Morris, Inc.*, 250 F.3d 789, 800 (3d Cir. 2001)).  "[C]ourts have generally relief upon the principles developed in the case law applying section 1983 to establish the outer perimeters of a *Bivens* claim against federal officials."  *Schrob v. Catterson*, 948 F.2d 1402, 1409 (3d Cir. 1991).

[2] Plaintiff names the following Defendants from USP-Allenwood: Warden Ricardo Martinez, Jennifer Holtzapple, Kevin Pigos, Lisa Rey, Joanne Russell, Sean Conlin, James Potope, and Edward Donlin.  In addition, Plaintiff names Bloomsburg Hospital and a urologist there, Anuj Chopra.  Finally, Plaintiff names the Bureau of Prisons ("BOP").  However, by memorandum and order dated June 16, 2011, the court granted a previously-filed motion to dismiss in favor of the BOP as it is not a proper party Defendant in a *Bivens* action, and terminated it as a party in this action.  (*See* Doc. 31.)  Thus, the BOP are again terminated as a party in this action.

were deliberately indifferent to his serious medical needs following surgery related to his prostate cancer.

Before the court is a motion to dismiss and for summary judgment filed on behalf of Defendants.  (Doc. 49.)  For the reasons set forth below, the motion for summary judgment will be granted in favor of Defendants.

## I.  **Background**

In his amended complaint, Plaintiff alleges that on October 7, 2008, he underwent a "radical prostatectomy that required major surgery."  (Doc. 32 at 1.) Following his surgery, he returned to USP-Allenwood.  (*See id*.)  In connection with his post-surgery care at USP-Allenwood, Plaintiff claims that "(1) [Defendants] failed to provide the proper standard of care; (2) [Defendants] willfully neglected to maintain a proper delivery of aftercare; (3) the onsite medical staff at USP-Allenwood was untrained to deal with the seriousness of the medical issues of the plaintiff; (4) plaintiff was not provided with the minimal standard of care for a human being; (5) and [Defendants] kept the plaintiff in a contaminated, unsanitary environment, post-operatorily, that caused the plaintiff a major infection."  (*Id*. at 2.)  Plaintiff further alleges that the lack of Spanish-speaking personnel at USP-Allenwood delayed his care because personnel could not

2

understand his complaints.  (*Id.* at 3.)  As relief, Plaintiff seeks an order directing

that medical staff be trained to speak Spanish at USP-Allenwood, monetary

damages for pain and suffering, and an evidentiary hearing.  (*Id.* at 5.)

## A.   Facts

In support of their motion for summary judgment, Defendants submitted a

statement of material facts.[3]  (Doc. 52.)  Because Plaintiff has failed to file an

opposing statement of material facts, the following facts submitted by Defendants

are deemed admitted.[4]

Defendant Physician's Assistant ("PA") Jennifer Holtzapple reviewed the

medical records of Plaintiff relative to this action.  (Doc. 52 ¶ 27.)  Those records

reveal that on August 7, 2008, Plaintiff was seen by the in-house urologist and it

was determined that he had prostate cancer.  (*Id.*)  PA Holtzapple then submitted a

---

[3] In support of the instant motion and their statement of material facts, Defendants have submitted the declarations of K. Michael Sullivan and Jennifer Holtzapple, with supporting attachments. (Doc. 53-1-11.)  With irritation the court notes that the medical documents attached to Defendant Holtzapple's declaration are in no apparent order whatsoever, and thus are disorganized and confusing, at best.  However, where necessary, the court will supplement Defendants' asserted facts with citations to the medical record attached to Defendant Holtzapple's declaration.

[4] In his sur reply to the instant motion for summary judgment, Plaintiff asserts that he did, in fact, file a response to Defendants' statement of material facts on December 22, 2011.  (*See* Doc. 60 ¶ 3(c).)  From a review of the docket in this case, it appears that Plaintiff is referring to his brief in opposition to the instant motion, filed on December 27, 2011.  (Doc. 57.)  As this brief is not a counter statement of material facts, the court rejects Plaintiff's argument here with respect to submission of a counter statement of material facts.

consult to proceed with a radical prostatectomy as soon as possible.  (*Id*. ¶ 28.)

This medical encounter note was cosigned by Defendant Dr. Kevin Pigos.  (*Id*. ¶

29; Doc. 53-4 at 47.)

On September 16, 2008, PA Holtzapple reviewed a medical note written by

Defendant Lisa Rey, USP-Allenwood's Medical Records Technician ("MRT"),

requesting a physical examination, x-ray, and blood work for Plaintiff in

preparation for his prostate surgery.  (Doc. 52 ¶ 30.)  On September 17, 2008, PA

Holtzapple ordered the blood work and chest x-ray in preparation for Plaintiff's

prostate surgery.  (*Id*. ¶ 31.)  Further, on October 2, 2008, PA Holtzapple

conducted a physical examination of Plaintiff in preparation for the surgery, and

the examination was noted as unremarkable.  (*Id*. ¶ 32.)  In addition, Plaintiff was

counseled on a plan of care and he verbalized his understanding of the treatment

plan.  (*Id*. ¶ 33; Doc. 53-4 at 40.)  This medical encounter was cosigned by Dr.

Pigos on October 7, 2008.  (Doc. 52 ¶ 34; Doc. 53-4 at 41.)

After the October 7, 2008 prostatectomy, on October 8, 2008, Dr. Pigos

spoke with the outside physician who performed the surgery, and noted that

Plaintiff was doing well post-surgery with no complications.  (Doc. 53-4 at 38.)

Further, it was noted that Plaintiff would return to USP-Allenwood in two days.

(*Id*.)

4

Plaintiff returned to USP-Allenwood on October 10, 2008.  (Doc. 53-4 at 37.)  He voiced a complaint of pain of 6 on a 1-10 scale.  (*Id*.)  A catheter was in place, draining blood-tinged urine.  (*Id*.)  Plaintiff was prescribed several medications for pain management, given instructions on use of the catheter, and told of the need to change his dressing daily.  (*Id*.)  Also, he was told to follow up at the next urology clinic.  (*Id*.)  This clinical encounter/administrative note was cosigned by Dr. Pigos on October 14, 2008.  (*Id*.)

On October 11, 2008, a staff nurse examined Plaintiff, gave him sterile gauze and tape for incision care, and gave him Tylenol #3 (with codeine) as prescribed.  (*Id*. at 36.)  The medical encounter, cosigned by Dr. Pigos on October 14, 2008, also noted that Plaintiff was ambulating about his cell with no problems, had a catheter in place and urine was clearing up, but was voicing complaints about some pain.  (*Id*.)  As a result, the note indicated that Plaintiff would continue to be monitored and given medication as provided.  (*Id*.)

On October 13, 2008, PA Holtzapple saw Plaintiff while doing rounds and gave him Tylenol #3 for pain, despite him telling her that he does not have much pain, only constipation.  (Doc. 52 ¶ 35; Doc. 53-4 at 35.)  PA Holtzapple explained to Plaintiff that the Tylenol #3 could cause constipation, and Plaintiff responded that he would only take the medication if he was having pain.  (Doc. 52 ¶ 36; Doc.

53-4 at 35.)  She then gave Plaintiff sterile gauze for a dressing change and medication for his constipation.  (Doc. 52 ¶ 37; Doc. 53-4 at 35.)  She also told Plaintiff to inform medical staff if any problems with his care arose and to drink a lot of water, both instructions of which he stated he understood.  (Doc. 52 ¶ 39; Doc. 53-4 at 35.)  Finally, she scheduled a consult with the in-house urologist for the next urology clinic.  (Doc. 52 ¶ 38; Doc. 53-4 at 35.)  This medical encounter was cosigned by Dr. Pigos on October 14, 2008.  (Doc. 52 ¶ 40; Doc. 53-4 at 35.)

PA Holtzapple examined Plaintiff again on October 13, 2008, after he complained of being cold and having trouble breathing due to his pre-existing asthma.  (Doc. 52 ¶ 41; Doc. 53-4 at 33.)  Plaintiff's vital signs were within normal limits, but a rectal examination revealed hemorrhoids.  (Doc. 52 ¶ 42; Doc. 53-4 at 34.)  He was prescribed a nebulizer, an additional jumpsuit to wear in his cell, and an extra blanket.  (Doc. 52 ¶ 43; Doc. 53-4 at 34.)  He was also encouraged to drink a lot of water and avoiding straining during bowel movements.  (Doc. 52 ¶ 43; Doc. 53-4 at 34.)  Plaintiff stated that he felt better after receiving the nebulizer, and understood the plan of care explained to him.  (Doc. 52 ¶ 44; Doc. 53-4 at 34.)  This clinical encounter was cosigned by Dr. Pigos on October 14, 2008.  (Doc. 52 ¶ 45; Doc. 53-4 at 34.)

On October 14, 2008, through Dr. Pigos, PA Holtzapple prescribed Plaintiff a stool softener (docusate sodium capsule) and an oxybutynin tablet to assist with a urinary problem.  (Doc. 52 ¶ 46; Doc. 53-4 at 32.)  Later that day, Defendant EMT Conlin examined Plaintiff, who stated that he was out of Motrin and continued to have moderate abdominal pain at the surgery site.  (Doc. 53-4 at 31.)  EMT Conlin gave Plaintiff twelve tablets of Motrin from the night stock immediately and instructed him to get additional refills at sick-call.  (*Id.*)

On October 15, 2008, after speaking with Defendant Dr. Chopra from Bloomsburg Hospital, PA Holtzapple directed Plaintiff to report to Health Services to have his staples removed.  (Doc. 52 ¶ 47; Doc. 53-4 at 30.)  Once the staples were removed, it was noted that the incision site had healed well with no signs of infection.  (Doc. 52 ¶ 48; Doc. 53-4 at 30.)  He was given a "leg bag" (a small bag that straps to your leg and is used in conjunction with a catheter) to use during the day and a wheelchair.  (Doc. 52 ¶ 49; Doc. 53-4 at 30.)  Plaintiff requested pain medication, and was prescribed Naproxen.  (Doc. 52 ¶ 50; Doc. 53-4 at 30.)

On October 24, 2008, Defendant Nurse Russell removed Plaintiff's catheter and noted no trauma.  (Doc. 53-4 at 29.)  Nurse Russell also examined a sore at the surgery incision site, now draining, and noted, "old tan [sic] discharge w/o odor and wound edges w/o erythema."  (*Id.*)  She cleaned the wound and covered it with

dry dressing.  (*Id*.)  She advised Plaintiff through an interpreter to wash the area

daily with soap and water and cover with dry dressing.  (*Id*.)  Nurse Russell sent

Plaintiff off with dressing supplies and instructed him to follow up with medical

staff the following week.  (*Id*.)  In the clinical encounter/administrative note, Nurse

Russell also noted that Plaintiff stopped her in the hallway later to ask her about a

swollen leg "since surgery," which was not painful.  (*Id*.)  She advised him to

follow up through sick-call.  (*Id*.)

On November 5, 2008, Nurse Russell examined Plaintiff for an open wound

at the incision site in his lower abdomen, swelling in his legs, and blurred vision.

(Doc. 53-4 at 25.)  She noted that the abdominal wound was open, "but with good

granulation tissue size."  (*Id*. at 26.)  She washed the wound and applied a dry

dressing.  (*Id*.)  She also noted that Plaintiff's swollen leg was resolved after

receiving the "leg bag."  (*Id*. at 27.)  She wrote a consult for the next optometry

clinic, and documented Plaintiff's current medications.  (*Id*.)  Further, she noted

that she would consult with PA Holtzapple for continued wound reassessment.

(*Id*.) Finally, she noted that Plaintiff verbalized his understanding of the plan of

care.  (*Id*.)

On November 12, 2008, Defendant EMT Donlin dispensed to Plaintiff one

pack of sixteen incontinence briefs.  (Doc. 53-4 at 24.)  On November 14, 2008,

Defendant EMT Potope examined Plaintiff and noted that 3-4 weeks post-prostate surgery, Plaintiff was using sixteen incontinence briefs in two days. (*Id*. at 23.) EMT Potope stated that Plaintiff needs to be reevaluated by primary medical staff to determine if Plaintiff was making appropriate progress. (*Id*.) He also stated that he would continue to provide Plaintiff with briefs at the 3:30 p.m. pill line. (*Id*.) Later on that same day, EMT Conlin dispensed to Plaintiff one pack of sixteen incontinence briefs, and noted that Plaintiff would need refills every few days. (*Id*. at 22.) Plaintiff was provided with refills on November 19, 2008 and December 11, 2008. (*Id*. at 19, 17.)

On November 14, 2008, MRT Rey completed an administrative note documenting that Plaintiff was having a liver biopsy, and would need various preliminary tests taken during the week of December 15, 2008. (*Id*. at 21.) On November 18, 2008, PA Holtzapple ordered the appropriate blood work for the liver biopsy. (Doc. 52 ¶ 51; Doc. 53-4 at 20.)

On December 5, 2008, PA Holtzapple entered an administrative note in Plaintiff's medical record noting that Plaintiff had been seen by the in-house urologist on December 4, 2008. (Doc. 52 ¶ 52; Doc. 53-4 at 18.) A quarterly blood test related to his prostate condition was ordered, and a consult was written for a follow-up with the urologist in three months. (Doc. 52 ¶ 52; Doc. 53-4 at 18.)

This administrative note was cosigned by Dr. Pigos on December 18, 2008.  (Doc. 52 ¶ 53; Doc. 53-4 at 18.)

On December 15, 2008, Plaintiff reported to Health Services claiming that he had an infection and pain at the site of his incision on his lower abdomen, and he had a fever over the weekend.  (Doc. 52 ¶ 54; Doc. 53-4 at 15.)  PA Holtzapple examined him, noting that he had no fever, but he did have redness, tenderness and warmth around the incision site.  (Doc. 52 ¶ 55; Doc. 53-4 at 15.)  She prescribed him with an antibiotic (Cephalexin) and pain medication (Acetaminophen), and instructed him to follow-up at sick call as needed, or return to Health Services immediately if his condition worsened, or come back within two to three days if there was no improvement.  (Doc. 52 ¶ 56; Doc. 53-4 at 16.)  PA Holtzapple counseled Plaintiff on the plan of care, and he verbalized his understanding.  (Doc. 52 ¶ 57; Doc. 53-4 at 16.)

Several hours later on that same day, December 15, 2008, Plaintiff returned to Health Services and noted that his incision had opened and puss was coming out of it.  (Doc. 52 ¶ 58; Doc. 53-4 at 14.)  PA Holtzapple noted a hole on the left side of his abdomen where the puss was draining.  (Doc. 52 ¶ 59; Doc. 53-4 at 14.)  She consulted with Dr. Pigos, who directed her to send Plaintiff to the local urologist, Dr. Chopra, at Bloomsburg Hospital that same day for evaluation.  (Doc. 52 ¶ 60;

Doc. 53-4 at 14.)  She wrote the consult to send Plaintiff to Dr. Chopra and cleaned

and bandaged the wound.  (Doc. 52 ¶ 61; Doc. 53-4 at 14.)

Several administrative notes were made regarding Plaintiff's outside care at

Bloomsburg Hospital and his return to USP-Allenwood in the days following

Plaintiff's December 15, 2008 encounter at Health Services.  On December 16,

2008, EMT Potope noted that Plaintiff was transported to Bloomsburg Hospital on

December 15, 2008, for treatment of a possible infection at the incision site.  (Doc.

53-4 at 13.)  This administrative note was cosigned by Dr. Pigos on December 23,

2008.  (*Id*.)  Further, on December 16, 2008, EMT Potope noted that Dr. Chopra

called with an update on Plaintiff's status.  (*Id*. at 12.)  Dr. Chopra found on

Plaintiff a supra-pubic abscess near the rectal muscle, and was treating Plaintiff

with IV antibiotics.  (*Id*.)  If Plaintiff continued to improve, he would switch to oral

antibiotics and have the drain site re-packed daily to allow the area to heal over

time.  (*Id*.)  It was also noted that the Plaintiff was stable.  (*Id*.)  This administrative

note was cosigned by Dr. Pigos on December 23, 2008.  (*Id*.)  On December 17,

2008, EMT Potope noted that Plaintiff would remain at Bloomsburg Hospital to

treat his abdominal infection until late in the week, and that Plaintiff was stable.

(*Id*. at 11.)  This administrative note was cosigned by Dr. Pigos on December 23,

2008.  (*Id*.)  On December 18, 2008, EMT Potope noted that Plaintiff was being

11

released soon back to USP-Allenwood and would need his medication ready at that time. (*Id*. at 9.)  EMT Potope was awaiting a verbal order for medication from Dr. Chopra. (*Id*.)  This administrative note was cosigned by Dr. Pigos on December 29, 2008. (*Id*.)  On December 19, 2008, EMT Potope noted that Plaintiff would return that day and that all of his ordered oral medication was ready except for the Tylenol #3. (*Id*. at 8.)  He also noted that Plaintiff had pain at the drain site of 3 out of a 1-10 scale and that the drain site would be re-packed with dressing daily. (*Id*.)  This administrative note was cosigned by a Dr. Jay Miller on December 19, 2008. (*Id*.)

After Plaintiff's return to USP-Allenwood, he was seen at Health Services for a dressing change. (*See id*. at 6, 7.)  EMT Donlin noted that there was minimal drainage on the old dressings when he removed them. (*Id*. at 6.)  The wounds looked moist and pink, and he redressed them with saline gauze and an abdominal pad. (*Id*.)  Plaintiff was informed to follow-up at sick-call in the morning. (*Id*.)  This administrative note was cosigned by Dr. Pigos on December 29, 2008. (*Id*.)

On December 22, 2008, PA Holtzapple changed Plaintiff's dressing without incident with gauze and sterile saline. (Doc. 52 ¶ 62; Doc. 53-4 at 5.)  She instructed him to return the next day at the same time for a dressing change and renewed his urology medication (Doxazosin). (Doc. 52 ¶ 62, 63; Doc. 53-4 at 5.)

Thereafter, the record contains administrative notes from December 23, 2008 through January 29, 2009, noting daily dressing changes. (Doc. 53-4 at 1-4; Doc. 53-3 at 57-59; Doc. 53-7 at 1-4; Doc. 53-6 at 38-60.) On December 26, 2008, Plaintiff noted no complaints and denied having pain. (Doc. 53-4 at 1.) On December 27, 2008, no drainage and no signs of infection were noted, and Plaintiff noted no pain. (Doc. 53-3 at 59.) On December 29, 2008, a moderate amount of greenish discharge was noted on Plaintiff's old dressing. (*Id*. at 58.) On December 31, 2008, no drainage was noted and the wound appeared to be healing well. (*Id*. at 57.) On January 4, 2009, it was noted that the wound looked much improved and there were no signs of infection. (Doc. 53-7 at 1.) On January 12, 2009, Plaintiff reported to Health Services to have his dressing changed, and it was noted that the wound was continuing to heal well and that there were no signs of infection. (Doc. 52 ¶ 64; Doc. 53-6 at 55.) On January 15, 2009, Plaintiff reported to Health Services to have his dressing changed, and it was noted that the wound was continuing to heal well and that there was no redness or drainage. (Doc. 52 ¶ 66; Doc. 53-6 at 52.) He was instructed to return the next day. (Doc. 52 ¶ 67; Doc. 53-6 at 52.)

On January 26, 2009, Plaintiff was examined during his quarterly chronic care clinic and it was noted that he was still waiting for a liver biopsy, which had

been postponed due to his prostatectomy.  (Doc. 52 ¶ 68; Doc. 53-6 at 41.)

Plaintiff did not have any complaints and noted that his abdominal wound was

healing well.  (Doc. 52 ¶ 69; Doc. 53-6 at 41.)  His vital signs showed a slight

elevation in blood pressure, but otherwise the examination was unremarkable.

(Doc. 52 ¶ 70; Doc. 53-6 at 41.)  His medications for asthma, high cholesterol, high

blood pressure, and urology symptoms were renewed; routine blood work was

ordered; a new medication was added for the elevated blood pressure; and a

follow-up chronic care clinic visit was scheduled.  (Doc. 52 ¶¶ 71, 72; Doc. 53-6 at

41-43.)  In addition, Plaintiff was counseled on the plan of care, and he verbalized

his understanding.  (Doc. 53-6 at 43.)  This clinical encounter note was cosigned

by Dr. Pigos on January 27, 2009.  (*Id*.)

On January 29, 2009, EMT Conlin changed the dressings at Plaintiff's

abdominal incision wound.  (Doc. 53-6 at 38.)  In his administrative note from this

encounter, EMT Conlin noted that Dr. Pigos advised him that the daily dressing

changes can now be every other day and packing the wound would no longer be

needed.  (*Id*.)

On February 2, 2009, Plaintiff reported to Health Services to have his

dressing changed, and it was noted that the wound was almost completely healed,

but had a foul smell to it since Plaintiff took the dressing off himself two days

earlier.  (Doc. 52 ¶ 74; Doc. 53-6 at 36.)  PA Holtzapple cleaned the wound and applied a new dressing.  (Doc. 52 ¶ 75; Doc. 53-6 at 36.)  She then gave Plaintiff his own gauze and tape and instructed him that he could shower and wash the area with soap and water before his next dressing change.  (Doc. 52 ¶ 76; Doc. 53-6 at 36.)  His next dressing change occurred on February 5, 2009, and again on February 7, 2009.  (Doc. 53-6 at 35, 33.)

On February 9, 2009, Plaintiff reported to Health Services to have his dressing changed, and it was noted that the wound was healed and there was no discharge on the gauze.  (Doc. 52 ¶ 77; Doc. 53-6 at 32.)  As a result, the dressing changes were discontinued and he was instructed to report to Health Services immediately if any problems arose.  (Doc. 52 ¶ 78; Doc. 53-6 at 32.)

On March 3, 2009, Plaintiff went to Health Services with complaints that his abdominal wound that previously was closed was now leaking a clear fluid and the site was tender.  (Doc. 53-6 at 29.)  Upon examination, Nurse Russell noted that Plaintiff's abdominal incision wound appeared to be well healed except for a small two millimeter opening.  (*Id*.)  She also noted that she could not see any drainage from the opening, but the area was tender.  (*Id*.)  As a result, she issued Plaintiff dressings to contain any drainage, and referred him for a follow-up appointment.  (*Id*.)

On March 5, 2009, PA Holtzapple noted that Plaintiff had been seen by an in-house urologist who had prescribed him with medication (Oxybutynin) to assist him with his urinary problem, and recommended quarterly prostate specific antigen (PSA) tests.  (Doc. 52 ¶ 79; Doc. 53-6 at 28.)

On March 9, 2009, blood work was ordered for a liver biopsy, unrelated to his prostate cancer, and the liver biopsy was scheduled.  (Doc. 52 ¶ 80; Doc. 53-6 at 26-27.)  Also on March 9, 2009, Plaintiff came to Health Services complaining that when he was changing the dressing of his incision wound, some yellowish puss was stuck to the gauze and the wound opened up with some bleeding when he pushed on it.  (Doc. 53-6 at 24.)  Upon examination, EMT Donlin noted that the wound had reopened slightly, but with no discharge or active bleeding, and no signs of active infection.  (*Id*.)  As a result, he redressed the wound with gauze, noting that the scabbing of the wound may have adhered to the bandage causing the wound to reopen when the bandage was removed.  (*Id*.)  EMT Donlin then instructed Plaintiff to continue with the dressing changes, and Plaintiff verbalized his understanding.  (*Id*.)

On March 11, 2009, Plaintiff was examined at Health Services for complaints of a cold, and was referred to PA Holtzapple as his primary care

provider for follow-up care and to the commissary for cold medication.  (Doc. 52 ¶ 81; Doc. 53-6 at 23.)

On March 16, 2009, Plaintiff was examined at Health Services by PA Holtzapple for complaints of a productive cough with yellowish green phlegm. (Doc. 52 ¶ 82; Doc. 53-6 at 21.)  Upon examination, PA Holtzapple noted that Plaintiff was wheezing and diagnosed him with an acute upper respiratory infection.  (Doc. 52 ¶ 83; Doc. 53-6 at 22.)  She prescribed an antibiotic (Amoxicillin), instructed Plaintiff to return to sick-call if there was no improvement, or follow-up at sick-call or the chronic care clinic as needed.  (Doc. 52 ¶ 84; Doc. 53-6 at 22.)  Plaintiff verbalized his understanding of this plan of care.  (Doc. 52 ¶ 84; Doc. 53-6 at 22.)

On April 21, 2009, Plaintiff failed to appear for his regularly scheduled chronic care clinic.  (Doc. 52 ¶ 85; Doc. 53-6 at 17.)  He did appear for the chronic care clinic on April 24, 2009, stating that he was taking his medication daily, had recently had a liver biopsy, and had no current complaints.  (Doc. 52 ¶¶ 86, 87; Doc. 53-6 at 13-16.)  PA Holtzapple examined him and noted that his vital signs were unremarkable, renewed his medications for asthma, high cholesterol, high blood pressure, and urology symptoms, and ordered routine blood work.  (Doc. 52 ¶ 88; Doc. 53-6 at 14-15.)  Additionally, she scheduled him for a follow-up chronic

care clinic visit, counseled Plaintiff with the plan of care, after which he verbalized his understanding.  (Doc. 52 ¶¶ 89, 90; Doc. 53-6 at 15.)  This clinical encounter note was cosigned by Dr. Pigos on April 24, 2009.  (Doc. 52 ¶ 91; Doc. 53-6 at 16.)

On June 15, 2009, Plaintiff was examined at Health Services for complaints of a sore throat and cough, but stated that he was not taking any medication for it. (Doc. 53-6 at 7.)  Upon examination, the PA recommended increasing fluids, obtaining cold/pain medications from the commissary, and resting.  (*Id*. at 8.)  In addition, Plaintiff was instructed to follow-up at sick-call if symptoms did not improve in 3-5 days.  (*Id*.)  He was counseled on his plan of care, and he verbalized his understanding.  (*Id*.)

On August 14, 2009, Plaintiff was seen for his quarterly chronic care clinic by PA Holtzapple.  (Doc. 52 ¶ 92; Doc. 53-5 at 60; Doc. 53-6 at 1-4.)  Plaintiff stated that he takes his medication daily and exercises.  (Doc. 52 ¶ 92; Doc. 53-5 at 60.)  Upon examination, PA Holtzapple noted that Plaintiff's vital signs and examination were unremarkable.  (Doc. 52 ¶ 93; Doc. 53-5 at 60; Doc. 53-6 at 1.) She renewed his medication for asthma, high cholesterol, high blood pressure, and urology symptoms, and ordered routine blood work.  (Doc. 52 ¶ 93; Doc. 53-6 at 1-2.)  She ordered a follow-up chronic care clinic visit, and instructed Plaintiff to

return to sick-call and the chronic care clinic as needed.  (Doc. 52 ¶ 94; Doc. 53-6

at 3.)  She counseled Plaintiff on the plan of care, and he verbalized his

understanding.  (Doc. 52 ¶ 94; Doc. 53-6 at 3.)  This clinical encounter note was

cosigned by Dr. Pigos on August 14, 2009.  (Doc. 52 ¶ 95; Doc. 53-6 at 4.)

On September 29, 2009, PA Holtzapple submitted a consult for Plaintiff to

be seen for a follow-up with the in-house urologist.  (Doc. 52 ¶ 96; Doc. 53-5 at

59.)  Further, on September 30, 2009, Plaintiff was examined at Health Services

for a complaint of pain in his foot due to a corn.  (Doc. 53-5 at 57.)  His complaint

was referred to his primary care provider, and he was instructed to follow-up at

sick call as needed.  (*Id*. at 57-58.)

On October 7, 2009, Plaintiff failed to appear for a scheduled visit with PA

Holtzapple that he had requested on September 30, 2009.  (Doc. 52 ¶ 97; Doc. 53-5

at 56.)  However, on October 9, 2009, Nurse Russell examined Plaintiff at Health

Services for his complaints about the corn on his foot.  (Doc. 53-5 at 54-55.)

Nurse Russell noted that Plaintiff had failed to appear for a scheduled appointment,

and prescribed a medicated pad for the corn, to be picked up at the pill line.  (*Id*. at

55.)

On October 23, 2009, Plaintiff was examined at Health Services after

complaining of feeling dizzy while at the gymnasium, and upon examination, PA

Holtzapple noted that his vitals were normal.  (Doc. 52 ¶ 99; Doc. 53-5 at 52.)

However, she gave him a one-day medical idle and instructed him to return

immediately if he had any pain, shortness of breath, or if his symptoms did not

improve.  (Doc. 52 ¶ 100; Doc. 53-5 at 53.)  She counseled Plaintiff on the plan of

care, and he verbalized his understanding.  (Doc. 52 ¶ 101; Doc. 53-5 at 53.)

On November 19, 2009, PA Holtzapple reviewed a medical note from

Plaintiff's follow-up visit with the in-house urologist on November 2, 2009.  (Doc.

52 ¶ 102; Doc. 53-5 at 48.)  She noted that the urologist wanted to continue the

prostate specific antigen ("PSA") tests every three months and follow-up visits

every four to five months.  (Doc. 52 ¶ 103; Doc. 53-5 at 48.)

On November 23, 2009, during a chronic care clinic visit, Plaintiff stated

that he was taking his medication daily and denied any problems.  (Doc. 52 ¶ 104;

Doc. 53-5 at 44.)  Upon examination, PA Holtzapple found Plaintiff's vitals were

normal, ordered routine blood work, and scheduled him for his next chronic care

clinic visit.  (Doc. 52 ¶¶ 105, 106; Doc. 53-5 at 44-45.)  She instructed him to

follow-up at sick-call or the chronic care clinic as needed, counseled him on his

plan of care, and he verbalized his understanding.  (Doc. 52 ¶¶ 106, 107; Doc. 53-5

at 45.)  This clinical encounter note was cosigned by Dr. Jay Miller on November

23, 2009.  (Doc. 52 ¶ 108; Doc. 53-5 at 47.)

On December 23, 2009, it was noted that Plaintiff's blood work for his PSA on December 15, 2009, was rejected by the laboratory as a bad sample. (Doc. 52 ¶ 109.) The blood work was properly processed on December 21, 2009, and the results were within normal limits. (*Id*. ¶ 110.) Further, on January 18, 2010, the blood work results were reviewed and showed slightly elevated cholesterol. (*Id*. ¶ 111.)

On January 27, 2010, Plaintiff was given a chronic care clinic evaluation for hypertension and other problems at Health Services by Dr. Miller. (Doc. 53-9 at 18-21.) Dr. Miller reviewed Plaintiff's medical problems and recent lab results and renewed his medications. (*Id*. at 18.) He noted that Plaintiff was doing well, with no pain or other complaints, but had asthma. (*Id*.) He also noted that Plaintiff did not speak much English and no interpreter was available at that time. (*Id*.) He instructed Plaintiff to follow-up at sick-call as needed, counseled Plaintiff on his plan of care, and Plaintiff verbalized his understanding. (*Id*. at 20-21.)

On February 12, 2010, Plaintiff's high cholesterol medications were changed from gemfibrozil to niacin due to a change in USP-Allenwood's formulary. (Doc. 52 ¶ 112; Doc. 53-9 at 17.)

On February 16, 2010, Plaintiff was examined by PA Holtzapple during a chronic care clinic visit. (Doc. 52 ¶ 113; Doc. 53-9 at 13-16.) It was noted that

Plaintiff had been seen by a doctor a few weeks prior to this visit.  (Doc. 52 ¶ 113; Doc. 53-9 at 13.)  In addition, Plaintiff stated that he had started a blood pressure medication and he was doing okay with no side effects from the medication.  (Doc. 52 ¶ 114; Doc. 53-9 at 13.)  Upon examination, PA Holtzapple noted all findings were within normal limits, ordered routine blood work, renewed his medications, and instructed Plaintiff to follow-up at sick-call or the chronic care clinic as needed.  (Doc. 52 ¶ 115; Doc. 53-9 at 13-15.)  She counseled Plaintiff on his plan of care, and he verbalized his understanding.  (Doc. 52 ¶ 116; Doc. 53-9 at 15.)  This clinical encounter note was cosigned by Dr. Miller on February 16, 2010.  (Doc. 52 ¶ 117; Doc. 53-9 at 16.)

On February 19, 2010, upon review of Plaintiff's blood work that was ordered as part of his chronic care clinic evaluation, it was noted he had slightly elevated cholesterol levels.  (Doc. 52 ¶ 118.)

On March 3, 2010, Plaintiff was examined at Health Services after complaining of trouble breathing and a non-productive cough.  (Doc. 53-9 at 10.)  He was instructed to continue using his inhaler and follow-up at sick-call or the chronic care clinic as needed.  (*Id*. at 11.)  He was counseled on his plan of care, and he verbalized his understanding.  (*Id*. at 11.)  This clinical encounter note was co-signed by a Dr. Santos on March 3, 2010.  (*Id*. at 12.)

On March 5, 2010, Plaintiff was examined at Health Services by another PA after complaining of a rash, a burning feeling, and sleeplessness while taking his high cholesterol medication.  (Doc. 52 ¶ 119; Doc. 53-9 at 8.)  He was instructed to stop taking the medication until evaluated by PA Holtzapple, and the PA forwarded the matter to PA Holtzapple for follow-up.  (Doc. 52 ¶ 119; Doc. 53-9 at 8.)  On March 11, 2010, PA Holtzapple prescribed aspirin to alleviate the burning feeling while taking the high cholesterol medication.  (Doc. ¶ 120; Doc. 53-9 at 7.)

On March 12, 2010, Plaintiff was examined at Health Services after complaining of a cough and difficulty breathing, and was treated with medication for an acute respiratory infection.  (Doc. 52 ¶ 121; Doc. 53-9 at 5-6.)  He was instructed to follow-up at sick-call as needed, counseled on his plan of care, and verbalized his understanding.  (Doc. 53-9 at 6.)

On March 22, 2010, PA Holtzapple reviewed Plaintiff's PSA levels and the results were undetectable.  (Doc. 52 ¶ 122.)  Further, on April 10, 2010, the results of Plaintiff's blood work, which was taken on April 7, 2010 as part of his chronic care clinic, were reviewed and showed slightly elevated cholesterol levels.  (*Id*. ¶ 123.)

On April 21, 2010, Plaintiff was seen at Health Services for a 9-month chronic care clinic evaluation.  (Doc. 53-9 at 1-4.)  His medical problems and

recent lab results were reviewed and his medications reviewed and renewed.  (*Id*. at 1.)  Dr. Miller noted that Plaintiff was doing well, but had been seen previously for trouble breathing due to a medication.  (*Id*.)  Plaintiff was instructed to follow-up at sick-call as needed, counseled on his plan of care, and Plaintiff verbalized his understanding.  (*Id*. at 4.)

On May 13, 2010, Plaintiff was seen by an in-house urologist for a possible urinary obstruction.  (Doc. 52 ¶ 124; Doc. 53-8 at 59-60.)  PA Holtzapple reviewed the urologist's notes and ordered PSAs to be taken every six months and wrote a consult for a cystoscopy.  (Doc. 52 ¶ 125; Doc. 53-8 at 59.)  This medical encounter note was cosigned by a Dr. Brian Buschman.  (Doc. 52 ¶ 126; Doc. 53-8 at 60.)  Later that same day, Plaintiff was seen at Health Services for his quarterly chronic care clinic.  (Doc. 52 ¶ 127; Doc. 53-8 at 57.)  PA Holtzapple noted that Plaintiff had been seen on April 21, 2010, by Dr. Miller.  (Doc. 52 ¶ 128; Doc. 53-8 at 57.)  During this May 13, 2010 appointment, Plaintiff voiced no new complaints or concerns.  (Doc. 52 ¶ 128; Doc. 53-8 at 57.)

On June 10, 2010, Plaintiff's PSA levels were reviewed and the results were undetectable.  (Doc. 52 ¶ 129.)

On July 21, 2010, Plaintiff was seen by Dr. Buschman at Health Services for a chronic care clinic.  (Doc. 53-8 at 53-56.)  Dr. Buschman noted Plaintiff's

complaint of a cough that had been getting worse since using a combivent, a medication for his asthma.  (*Id*. at 53.)  He also noted Plaintiff's current medications, and instructed him to follow-up at the chronic care clinic as needed.  (*Id*. at 53-55.)  In addition, he counseled Plaintiff on his plan of care, and Plaintiff verbalized his understanding.  (*Id*. at 55.)

On July 27, 2010, Plaintiff was seen at Health Services at sick-call for complaints about his asthma.  (Doc. 52 ¶ 130; Doc. 53-8 at 50-52.)  Plaintiff was informed that a change to his asthma medication was made due to the institution's change in medication formulary.  (Doc. 53-8 at 51.)  The PA also noted that Plaintiff appeared to have no breathing problems at the time.  (Doc. 52 ¶ 130; Doc. 53-8 at 51.)  Plaintiff was instructed to follow-up at sick-call as needed, was counseled on his plan of care, and Plaintiff verbalized his understanding.  (Doc. 53-8 at 51.)  PA Holtzapple reviewed this medical encounter note and it was cosigned by Dr. Buschman on July 27, 2010.  (Doc. 52 ¶ 131; Doc. 53-8 at 51-52.)

Later that same day, July 27, 2010, PA Holtzapple reviewed a medical encounter note written by MRT Rey, requesting a chest x-ray and blood work for Plaintiff in preparation for his cystoscopy and possible ureterotomy.  (Doc. 52 ¶ 132; Doc. 53-8 at 48.)  The results of the chest x-ray were negative.  (Doc. 52 ¶ 133.)

On August 11, 2010, Plaintiff was seen at Health Services for complaints related to his asthma.  (Doc. 52 ¶ 134; Doc. 53-8 at 44-46.)  Plaintiff was examined after complaining that he would like to change his medication, treated, and scheduled for an evaluation with PA Holtzapple.  (Doc. 52 ¶ 135; Doc. 53-8 at 44-45.)  PA Holtzapple reviewed this medical encounter note and it was cosigned by Dr. Buschman on August 11, 2010.  (Doc. 52 ¶ 136; Doc. 53-8 at 45-46.)

On August 16, 2010, Plaintiff failed to appear for his appointment previously scheduled.  (Doc. 52 ¶ 137; Doc. 53-8 at 43.)  However, the results of his blood work ordered during the last chronic care clinic were reviewed and they showed that Plaintiff's cholesterol levels were elevated.  (Doc. 52 ¶ 138.)  In addition, the blood work ordered for his cystoscopy showed results within normal limits.  (*Id.* ¶ 139.)

On August 17, 2010, Plaintiff went to an outside medical facility to have the cystoscopy performed by a urologist.  (Doc. 52 ¶ 140; Doc. 53-8 at 41.)  Upon his return, he was prescribed an antibiotic (Ciprofloxacin) and was scheduled to have his foley catheter removed on August 20, 2010.  (Doc. 52 ¶ 141; Doc. 53-8 at 41.)  This medical encounter note was cosigned by Dr. Buschman on August 17, 2010.  (Doc. 52 ¶ 142; Doc. 53-8 at 42.)  Also on August 17, 2010, Plaintiff requested a

change to his asthma medication, which was done, and he was provided a wheelchair and a medical idle for three days.  (Doc. 52 ¶ 142; Doc. 53-8 at 40.)

On August 23, 2010, Plaintiff was seen at Health Services at sick-call for complaints of burning and difficulty with urination.  (Doc. 52 ¶ 144; Doc. 53-8 at 37.)  He was scheduled for urine tests and instructed to follow-up at sick-call as needed.  (Doc. 53-8 at 38.)  This medical encounter note was reviewed by PA Holtzapple and cosigned by Dr. Buschman on August 23, 2010.  (Doc. 52 ¶¶ 144, 145; Doc. 53-8 at 39.)

On August 26, 2010, PA Holtzapple reviewed the "Operative Report - Preliminary Report" submitted by Dr. Chopra regarding Plaintiff's cystoscopy, which stated that Plaintiff tolerated the procedure well and without any complications.  (Doc. 52 ¶ 146.)

On August 31, 2010, Plaintiff was seen at Health Services at sick-call complaining that ever since he had the cystoscopy he has had a burning sensation in the area above his penis that extends to his rectum.  (Doc. 52 ¶ 147; Doc. 53-8 at 35.)  He stated that the burning pain was constant, and nothing was making it worse or better.  (Doc. 52 ¶ 148; Doc. 53-8 at 35.)  He denied pain with urination, but stated that he is not emptying completely.  (Doc. 52 ¶ 148; Doc. 53-8 at 35.)  Plaintiff's examination was unremarkable, but the urinalysis showed small

amounts of blood and protein, but no leukocytes (white blood cells).  (Doc. 52 ¶ 149; Doc. 53-8 at 35.)  PA Holtzapple prescribed Motrin for the pain, ordered a repeat urinalysis, and consulted with Dr. Buschman.  (Doc. 52 ¶ 150; Doc. 53-8 at 36.)  She noted that Dr. Buschman thought that the pain was the lingering effects of the cystoscopy with laser.  (Doc. 52 ¶ 151; Doc. 53-8 at 36.)  Plaintiff was counseled on his plan of care, and he verbalized his understanding.  (Doc. 52 ¶ 152; Doc. 53-8 at 36.)

On September 9, 2010, the results of the repeat urinalysis revealed trace amounts of leukocytes and another repeat urinalysis was ordered.  (Doc. 52 ¶ 153.)  On September 14, 2010, Plaintiff had a repeat urinalysis that revealed a urinary tract infection.  (Doc. 52 ¶ 154; Doc. 53-8 at 33.)  He stated that he has some burning with urination.  (Doc. 52 ¶ 155; Doc. 53-8 at 33.)  As a result, he was treated with an antibiotic (Amoxicillin) and a follow-up urinalysis was ordered for two weeks later.  (Doc. 52 ¶ 156; Doc. 53-8 at 33.)

On September 17, 2010, Plaintiff was seen at Health Services at sick-call complaining that his asthma was acting up, and that he has been coughing and wheezing for almost a week and using the inhaler without relief.  (Doc. 52 ¶ 157; Doc. 53-8 at 31.)  He was examined and treated for an acute upper respiratory infection, and instructed to follow-up at sick-call as needed and to return

immediately if the condition worsened or did not improve.  (Doc. 52 ¶¶ 157, 158;

Doc. 53-8 at 32.)  He was counseled on his plan of care, and he verbalized his

understanding.  (Doc. 52 ¶ 159; Doc. 53-8 at 32.)

On September 22, 2010, Plaintiff was seen at Health Services for complaints

of wheezing.  (Doc. 53-8 at 28-30.)  He stated that he has been on medication for

eight days and is getting no relief.  (*Id*. at 28.)  EMT Lesher examined Plaintiff and

instructed him to finish his medications as prescribed, to drink plenty of fluids, and

prescribed Tylenol (for fever) and bed rest.  (*Id*. at 29.)  His inhaler prescription

was renewed, and he was instructed to follow-up at sick-call as needed.  (*Id*.)

Further, EMT Lesher consulted Dr. Buschman, who recommended a change to the

antibiotic.  (*Id*.)  Plaintiff was counseled on his plan of care, and he verbalized his

understanding.  (*Id*.)

On September 27, 2010, Plaintiff was seen at Health Services for a follow-

up urinalysis.  (Doc. 52 ¶ 160; Doc. 53-8 at 27.)  Plaintiff stated that his signs and

symptoms had gone away and he had no further problems.  (Doc. 52 ¶ 161; Doc.

53-8 at 27.)  The urinalysis revealed a trace of leukocytes, but after consultation

with Dr. Buschman, it was determined that because Plaintiff was asymptomatic, he

would not require additional treatment.  (Doc. 52 ¶¶ 162, 163; Doc. 53-8 at 27.)

Later that same day, PA Holtzapple renewed Plaintiff's prescription for asthma inhalers.  (Doc. 52 ¶ 164; Doc. 53-8 at 26.)

On October 14, 2010, PA Holtzapple reviewed the results of Plaintiff's blood test for Hepatitis.  (Doc. 52 ¶ 165.)  Further, on October 15, 2010, Plaintiff was seen at Health Services for his quarterly chronic care clinic.  (Doc. 52 ¶ 166; Doc. 53-8 at 21-25.)  At that time, he stated that he was doing okay, his cough was better, he was taking his medications as prescribed, and was displaying no symptoms.  (Doc. 52 ¶ 166; Doc. 53-8 at 21.)  It was noted that his quarterly PSAs were completed and the last two results were so low that they were undetectable.  (Doc. 52 ¶ 167.)  His vital signs and examination were unremarkable.  (Doc. 52 ¶ 168; Doc. 53-8 at 21-22.)  His medications for asthma, high cholesterol, high blood pressure, and urology symptoms were renewed.  (Doc. 52 ¶ 168; Doc. 53-8 at 23-24.)  Plaintiff was instructed to follow-up at sick-call or the chronic care clinic as needed.  (Doc. 52 ¶ 169; Doc. 53-8 at 24.)  Plaintiff was counseled on his plan of care, and he verbalized his understanding.  (Doc. 52 ¶ 169; Doc. 53-8 at 24.)  This medical encounter note was cosigned by Dr. Buschman on October 15, 2010. (Doc. 52 ¶ 170; Doc. 53-8 at 25.)

On January 14, 2011, Plaintiff was seen at Health Services for a chronic care clinic evaluation.  (Doc. 53-11 at 15-17.)  Dr. Buschman reviewed Plaintiff's

medical problems and recent lab results with him.  (*Id*. at 15-16.)  Dr. Buschman

noted:

> All communications were translated through Carlos Concepcion who
> he brought with him to translate.  I at times clarified things to help the
> translator be able to translate all of what is documented above.  He did
> appear to know some English as he did respond to a few of my
> questions before his translator was able to translate them.  He also
> responded to hearing my radio announce a move in English.

(*Id*. at 15.)  Plaintiff was instructed to follow-up at the chronic care clinic as

needed, was counseled on his plan of care, and Plaintiff verbalized his

understanding.  (*Id*. at 16-17.)

On February 7, 2011, Plaintiff was seen at Health Services at sick-call for

complaints related to cold or flu symptoms.  (Doc. 53-11 at 12-14.)  Specifically,

Plaintiff complained of a fever, productive cough, body aches, and nausea.  (*Id*. at

12.)  PA DiMicco diagnosed him with unspecified problems resulting from his

asthma and an acute upper respiratory infection.  (*Id*. at 13.)  As a result, Plaintiff

was prescribed Prednisone for his asthma and Doxycycline for the upper

respiratory infection.  (*Id*.)  He was instructed to follow-up at sick-call or chronic

care clinic as needed, and to return to sick-call if the symptoms did not improve.

(*Id*.)  He was counseled on his plan of care, and verbalized his understanding.  (*Id*.

at 13.)

On April 5, 2011, Plaintiff was seen at Health Services at sick-call for complaints of urinating at night (nocturia) and pain while urinating.  (*Id*. at 8-9.) Upon examination, PA DiMicco noted abdominal tenderness and recommended a repeat of tests for PSA levels.  (*Id*. at 9.)  Urine tests were also ordered.  (*Id*.) Plaintiff was instructed to follow-up at sick-call or chronic care clinic as needed. (*Id*.)  He was counseled on his plan of care, and he verbalized his understanding. (*Id*.)  Also on April 5, 2011, a consult was written for a follow-up examination with the in-house urologist.  (*Id*. at 7.)

On April 7, 2011, Plaintiff was seen at Health Services for a chronic care clinic evaluation, not previously assigned.  (*Id*. at 1-6.)  PA DiMicco reviewed Plaintiff's medical problems with him and his medications were reviewed and renewed.  (*Id*. at 1-5.)  Plaintiff was instructed to follow-up at sick-call or chronic care clinic as needed.  (*Id*. at 5.)  In addition, Plaintiff was counseled on his diet and plan of care, and he verbalized his understanding.  (*Id*.)  This medical encounter note was cosigned by Dr. Buschman on April 7, 2011.  (*Id*. at 6.)

On June 3, 2011, Plaintiff was seen by the in-house urologist.  (Doc. 53-10 at 43.)  He was then seen by Dr. Chopra, the urologist at Bloomsburg Hospital. (*Id*. at 42.)  Dr. Chopra recommended ditropan or oxybutynin and a cystoscopy for

a possible recurrent stricture.  (*Id.*)  An administrative note documenting this visit was written by PA DiMicco on June 7, 2011.  (*Id.*)

On June 15, 2011, Plaintiff was seen at Health Services at sick-call for complaints of a urinary problem.  (*Id.* at 40-41.)  PA DiMicco noted that Plaintiff had been seen by a urologist, who recommended oxybutynin (or Ditropan) and a cystoscopy, but Plaintiff had experienced blurred vision, constipation, and dryness in the mouth since taking the oxybutynin.  (*Id.* at 40.)  As a result, the prescription for oxybutynin was discontinued and new medication (Tolterodine) was ordered. (*Id.*)  Plaintiff was instructed to follow-up at sick-call or chronic care clinic as needed, counseled on his plan of care, and Plaintiff verbalized his understanding. (*Id.* at 41.)

On June 30, 2011, Plaintiff was seen at Health Services for a chronic care clinic evaluation by Dr. Buschman.  (*Id.* at 34-39.)  Dr. Buschman noted that Plaintiff had seen Dr. Chopra earlier in the month and is scheduled for a cystoscopy.  (*Id.* at 34.)  He reviewed Plaintiff's medical problems with him and a translator, and scheduled Plaintiff's next chronic care clinic visit for September 30, 2011.  (*Id.* at 34-38.)  In addition, he counseled Plaintiff on his plan of care, and Plaintiff verbalized his understanding.  (*Id.* at 39.)

On July 27, 2011, PA Holtzapple reviewed Plaintiff's paperwork from his visit with an outside urologist.  (Doc. 52 ¶ 171; Doc. 53-10 at 30.)  She noted that Plaintiff had a cystoscopy on that date, and it revealed a bladder neck contracture. (Doc. 52 ¶ 171; Doc. 53-10 at 30.)  As a result, she wrote a consult for a follow-up appointment with the urologist.  (Doc. 52 ¶ 171; Doc. 53-10 at 30.)

**B.**   **Procedural History**

Plaintiff filed his initial complaint on August 19, 2010, against the BOP and Warden Martinez.  (Doc. 1.)  After waiving service of the complaint, Defendants filed a motion to dismiss the complaint on January 20, 2011.  (Doc. 20.)  Once ripe for disposition, the court issued a memorandum and order on June 16, 2011, granting the motion to dismiss as to the BOP and terminating it as a party in the action, and granting the motion to dismiss as to Warden Martinez without prejudice to Plaintiff's right to file an amended complaint asserting claims against him and any other potential Defendants, if possible.  (Doc. 31.)

Plaintiff filed an amended complaint on July 7, 2011.  (Doc. 32.)  Thereafter, Defendants filed the instant motion to dismiss and for summary judgment.  (Doc. 49.)  Responsive and reply briefings have been filed, and thus the motion is ripe for disposition.  (*See* Docs. 57, 59, 60.)

## II.   **Standards of Review**

### A.   **Motion to Dismiss**

Defendants have filed a motion which, in part, seeks dismissal of the

amended complaint on the grounds that Plaintiff's complaint fails to state a claim

upon which relief can be granted, as provided by Rule 12(b)(6) of the Federal

Rules of Civil Procedure.  The motion, however, goes beyond a simple motion to

dismiss under Rule 12(b)(6) because it is accompanied by evidentiary documents

outside the pleadings contravening Plaintiff's claims.  Rule 12(d) provides as

follows:

> If, on a motion under Rule 12(b)(6) or (12)(c), matters outside the
> pleadings are presented to and not excluded by the court, the motion
> must be treated as one for summary judgment under Rule 56.  All
> parties must be given a reasonable opportunity to present all the
> material that is pertinent to the motion.

Fed. R. Civ. P. 12(d).  The court will not exclude the evidentiary materials

accompanying Defendants' motion to dismiss because Plaintiff has also been given

a reasonable opportunity to present material relevant to the motion.  Thus,

Defendants' motion to dismiss and for summary judgment shall be treated solely as

seeking summary judgment.

### B.   **Motion for Summary Judgment**

Federal Rule of Civil Procedure 56 sets forth the standard and procedures for the grant of

summary judgment.  Rule 56(a) provides, "[t]he court shall grant summary judgment if the

movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)[5] ; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A factual dispute is "material" if it might affect the outcome of the suit under the applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine" only if there is a sufficient evidentiary basis that would allow a reasonable fact-finder to return a verdict for the non-moving party.  *Id*.  When evaluating a motion for summary judgment, a court "must view the facts in the light most favorable to the non-moving party," and draw all reasonable inferences in favor of the same.  *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005), *cert. denied*, 546 U.S. 1094 (2006).

The moving party bears the initial burden of demonstrating the absence of a disputed issue of material fact.  *See Celotex*, 477 U.S. at 324.  "Once the moving party points to evidence demonstrating no issue of material fact exists, the non-moving party has the duty to set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor."  *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 216 (3d Cir. 2010).  The non-moving party may not simply sit back and rest on the allegations in its complaint; instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324 (internal quotations omitted); *see also Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (citations omitted).  Summary

---

[5] *See* Fed. R. Civ. P. 56, Advisory Comm. Note (2010 Amendments) (The frequently cited standard for summary judgment is now set forth in Rule 56(a) rather than Rule 56(c)(2010). The Advisory Committee explains that despite the language change, "[t]he standard for granting summary judgment remains unchanged" and "[t]he amendments will not affect continuing development of the decisional law construing and applying these phrases.").

judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. "'Such affirmative evidence – regardless of whether it is direct or circumstantial – must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance.'" *Saldana*, 260 F.3d at 232 (quoting *Williams v. Borough of West Chester*, 891 F.2d 458, 460-61 (3d Cir. 1989)).

## III.   **Discussion**

In the instant motion, Defendants argue summary judgment should be granted in their favor because: (1) Defendants are entitled to sovereign immunity because they are being sued in their official capacities, (2) Defendant Russell is entitled to statutory immunity, (3) Plaintiff failed to exhaust his administrative remedies prior to filing his complaint, and (4) Plaintiff has failed to state an Eighth Amendment claim for deliberate indifference to his serious medical needs. Further, Defendants contend that the amended complaint should be dismissed because Plaintiff has failed to allege any personal involvement by Defendants and respondeat superior cannot form the basis of a *Bivens* action.   In the alternative, Defendants argue that Defendant Martinez is entitled to qualified immunity. Because the court will address below the merits of Plaintiff's Eighth Amendment claim, it need not address Defendants' other arguments.

Prison officials are required under the Eighth Amendment to provide basic medical treatment to prisoners.  *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976).  To demonstrate a *prima facie* case of Eighth Amendment cruel and unusual punishment based on the denial of medical care, a plaintiff must establish that the defendant acted with "deliberate indifference to [his] serious medical needs."  *Estelle*, 429 U.S. at 104 (1976);

38

*Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993).  There are two components to this standard: Initially, a plaintiff must make an "objective" showing that the deprivation was "sufficiently serious," or that the result of the defendant's denial was sufficiently serious.  Additionally, the plaintiff must make a "subjective" showing that the defendant acted with "a sufficiently culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *see also Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002).[6]

This test "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients.  Courts will 'disavow any attempt to second guess the propriety or adequacy of a particular course of treatment . . . which remains a question of sound professional judgment." *Little v. Lycoming County*, 912 F. Supp. 809, 815 (M.D. Pa. 1996) (citing *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979), quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

---

[6] The "deliberate indifference to serious medical needs" standard is obviously met when pain is intentionally inflicted on a prisoner, where the denial of reasonable requests for medical treatment exposes the inmate to undue suffering or the threat of tangible residual injury, or when, despite a clear need for medical care, there is an intentional refusal to provide that care.  *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004) (quoting *White v. Napolean*, 897 F.2d 103, 109 (3d Cir. 1990); *Monmouth Cnty. Corr. Instutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987).

When an inmate is provided with medical care and the dispute is over the adequacy of that care, an Eighth Amendment claim does not exist. *Nottingham v. Peoria*, 709 F. Supp. 542, 547 (M.D. Pa. 1988). Mere disagreement as to the proper medical treatment does not support an Eighth Amendment claim. *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834 F.2d 326, 346 (3d Cir. 1987). Only flagrantly egregious acts or omissions can violate the standard. Medical negligence alone cannot result in an Eighth Amendment violation, nor can any disagreements over the professional judgment of a health care provider. *White v. Napolean*, 897 F.2d 103, 108-10 (3d Cir. 1990). *See also Estelle*, 429 U.S. at 105-06 (medical malpractice is insufficient basis upon which to establish an Eighth Amendment violation); *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) ("It is well-settled that claims of negligence and medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'"); *Lanzaro*, 834 F.2d at 346 (mere allegations of malpractice do not raise issues of constitutional import).

Finally, in *Durmer*, the Third Circuit Court of Appeals added that a non-physician defendant cannot be considered deliberately indifferent for failing to respond to an inmate's medical complaints when he is already receiving treatment by the prison's medical staff. *Durmer*, 991 F.2d at 69. However, where a failure

or delay in providing prescribed treatment is deliberate and motivated by non-medical factors, a constitutional claim may be presented. *See id*.

In the instant case, throughout the relevant time period, Plaintiff was seen on numerous occasions by medical staff at USP-Allenwood for treatment of symptoms ranging from prostate cancer to urinary problems to asthma. He was repeatedly evaluated and was prescribed medication to ease his discomfort. Diagnostic tests were ordered, and eventually performed, to facilitate treatment. The record reflects that medical staff was addressing Plaintiff's medical concerns, such as an infection to the incision site post-prostate surgery, nearly every day during the relevant time period. Unfortunately, despite all the medical intervention, Plaintiff continued to suffer from discomfort after his prostate surgery. This is clearly a case where Plaintiff has been given medical attention and is dissatisfied with the course of treatment and subsequent results. An inmate's disagreement with medical treatment is insufficient to establish deliberate indifference. *Durmer*, 991 F.2d at 69; *Spruill*, 372 F.3d at 235. Courts will not second guess whether a particular course of treatment is adequate or proper. *Parham v. Johnson*, 126 F.3d 454, 458 n.7 (3d Cir. 1997). Moreover, there is nothing in the record demonstrating that any significant delay in treating Plaintiff's medical conditions was deliberate or intentional on the part of any Defendant. In

fact, Plaintiff himself delayed his treatment in part by failing to appear for several

appointments and refusing medications.  Further, while Plaintiff takes exception

with medical services delivered to Spanish-speaking inmates, the record reveals

that Plaintiff himself repeatedly verbalized his understanding of his plan of care,

and where necessary, a translator was provided.[7]  Under these circumstances and

based upon the well-documented course of treatment set forth in the record, the

court finds that Defendants were not deliberately indifferent to Plaintiff's medical

needs.[8]  Thus, Plaintiff has failed to establish an Eighth Amendment violation.

Defendants' motion for summary judgment will be granted.

---

[7] Further, any arguments or claims Plaintiff makes on behalf of other inmates are not permissible as *pro se* plaintiffs are not favored as representative parties in a class action since they generally cannot represent and protect the interests of the class fairly and adequately. *Caputo v. Fauver*, 800 F. Supp. 168, 170 (D. N.J. 1992), *aff'd*, 995 F.2d 216 (3d Cir. 1993) (table decision) (stating that "[e]very court that has considered the issue has held that a prisoner proceeding *pro se* is inadequate to represent the interests of his fellow inmates in a class action); *Cahn v. United States*, 269 F. Supp. 2d 537, 547 (D. N.J. 1992); *Whalen v. Wiley*, No. 06-809, 2007 WL 433340, at *2 (D. Col. Feb. 1, 2007) (finding that it is plain error to permit a *pro se* inmate litigant to represent fellow inmates).

[8] Where the medical Defendants have not been found to be deliberately indifferent in their treatment of Plaintiff, the non-physician Defendant Warden Martinez cannot be liable. *See Durmer*, 991 F.2d at 69.

## IV.    **Conclusion**

For the reasons set forth herein, the motion for summary judgment will be granted in favor of Defendants Martinez, Holtzapple, Pigos, Rey, Russell, Conlin, Potope, and Donlin.

An appropriate order will issue.

   s/Sylvia H. Rambo         <br>
United States District Judge

Dated:  July 18, 2012.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DULCIDIO QUIRINDONGO,** | : | |
| | : | |
| **Plaintiff** | : | **CIVIL NO. 1:CV-10-01742** |
| | : | |
| **v.** | : | **(Judge Rambo)** |
| | : | |
| **FEDERAL BUREAU OF PRISONS,** | : | |
| *et al.,* | : | |
| | : | |
| **Defendants** | : | |

## O R D E R

In accordance with the accompanying memorandum, **IT IS HEREBY ORDERED THAT**:

1) The motion for summary judgment (Doc. 49) is **GRANTED** with respect to Defendants Martinez, Holtzapple, Pigos, Rey, Russell, Conlin, Potope, and Donlin.

2) Entry of judgment on their behalf is **DEFERRED** pending further order of court.

s/Sylvia H. Rambo
United States District Judge

Dated:  July 18, 2012.